**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

MIGUEL RAMIREZ,

Plaintiff,

v.

COUNTY OF SAN DIEGO, *et al.*,

Defendants.

Case No. 24-cv-0366-BAS-JAC

**ORDER:**

1. **GRANTING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS COUNTY OF SAN DIEGO, ANDREW RODRIGUEZ, DARREN ABRAMS, AND WILLIAMS KEARNEY (ECF No. 60); AND**

2. **GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT DR. MARIA LOPEZ (ECF No. 61)**

Detective Kearney was investigating the smuggling of narcotics into San Diego Men's Central Jail. He suspected newly arrived inmate Mr. Ramirez as part of the operation. Officers conducted searches of Mr. Ramirez's cell, cellmate, and neighboring cell—all the searches revealed heroin. Detective Kearney suspected Mr. Ramirez of

concealing drugs on himself, too, specifically in his rectum. Two transportation deputies drove Mr. Ramirez to Alvarado Hospital in San Diego. There, Detective Kearney allegedly demanded the hospital perform a rectal examination instead of a CAT scan on Mr. Ramirez. Dr. Lopez, a medical doctor employed by Alvarado Hospital, performed the rectal examination and a CAT scan, then cleared Mr. Ramirez from the hospital; no drugs were found.

Mr. Ramirez now sues Detective Kearney, the transportation deputies, the County, and also Dr. Lopez. In essence, Mr. Ramirez states that he should never have received a rectal examination. Specifically, Mr. Ramirez claims (1) Detective Kearney violated his constitutional rights by demanding a rectal examination when the hospital was planning to perform a CAT scan; (2) the transportation deputies violated his constitutional rights by remaining passive, failing to intervene to stop the rectal examination; and (3) Dr. Lopez, who should be considered a state actor, violated his constitutional rights by performing the rectal examination. Further, Plaintiff brings an assortment of state law claims against all Defendants.

Presently before the Court are two motions for summary judgment or, in the alternative, partial summary judgment. One is filed by Defendants County of San Diego, Deputy Andrew Rodriguez, Deputy Darren Abrams, and Detective Williams Kearney ("County Defendants"). (ECF No. 60.) The other is filed by Defendant Dr. Maria Lopez ("Dr. Lopez"). (ECF No. 61.) Plaintiff Miguel Ramirez ("Plaintiff" or "Mr. Ramirez") opposed the motions. (ECF Nos. 64, 65.) Defendants replied. (ECF No. 69, 71.) The Court benefitted from oral argument to resolve the present motions. (ECF No. 76.)

## I. BACKGROUND

The parties agree on the following material facts. (ECF No. 70.)

Mr. Ramirez was a post-trial detainee. (*Id.* ¶ 1.) Detective Kearney was involved in investigating the suspected smuggling of narcotics into San Diego Men's Central Jail ("Central Jail") on January 4, 2023. (*Id.* ¶ 2.) By monitoring jail calls, Detective Kearney believed that narcotics had been brought into the 5th floor Module B of the Central Jail.

(*Id*. ¶ 3.) He further believed that the narcotics were being prepared for dissemination to other jail facilities. (*Id*.)

Detective Kearney identified Plaintiff as someone who was the most recent arrival in the 5th floor Module on January 4, 2023. (*Id*. ¶ 4.) A search conducted by jail deputies of the 5th floor Module revealed a black tar-like substance in plain view of the middle bunk within Mr. Ramirez's cell. (*Id*. ¶ 5.) The substance was identified as heroin. (*Id*.) There was also a pick located and believed to be used to divide up the drugs. (*Id*.) Mr. Ramirez's cellmate was found to be hiding a piece of plastic containing a black tar-like substance later identified as heroin during a visual strip search. (*Id*. ¶ 6.)

Search of the cell next to Plaintiff's cell revealed two bindles of heroin in the toilet. (*Id*. ¶ 7.) The bindles were made from the cut-out fingertips of a latex glove. (*Id*. ¶ 8.) Inside the bindles, deputies located a black tar-like substance identified as heroin and hand-written notes. (*Id*. ¶ 9.) These hand-written notes referenced an individual identified as "J from Logan" as the individual who brought "cariño," which jail deputies believed to be a reference to the heroin based upon their experience. (*Id*. ¶ 10.) Mr. Ramirez was documented in the past as being a Logan Heights gang member who goes by the moniker "Jester." (*Id*. ¶ 11.)

Two subsequent pelvic x-rays were performed on Plaintiff on January 4, 2023. (*Id*. ¶ 12.) An off-site radiologist interpreting these x-rays cleared Mr. Ramirez. (*Id*.) Detective Kearney believed he identified certain characteristics of the x-rays that could be indicative, though not definitive, of someone concealing narcotics in their pelvic area. (*Id*. ¶ 13.) Plaintiff was sent out to the hospital. (*Id*. ¶ 14.) Medical records show that the jail requested a CAT scan. (*Id*.) Deputy Abrams and Deputy Rodriguez, the deputies assigned to transport Plaintiff from the jail to the hospital, did not make any recommendations or requests to medical staff about what examinations should be done. (*Id*. ¶ 15.)

Medical records show that Dr. Lopez, an emergency room doctor employed by Alvarado Hospital, performed a digital cavity search on Mr. Ramirez. (*Id*. ¶ 16.) The result of the digital cavity search was negative for any contraband or narcotics. (*Id*. ¶ 17.) A CAT

scan was also performed on Mr. Ramirez's pelvic area that revealed no contraband. (*Id*. ¶ 18.) Mr. Ramirez was cleared from Alvarado Hospital and returned to the Central Jail by Deputies Abrams and Rodriguez. (*Id*. ¶ 19.)

Viewed in the light most favorable to Plaintiff, the record establishes the following additional facts, beginning with events preceding the January 4 cell search.

**Booking at San Diego Men's Central Jail**

On January 3, 2023, Mr. Ramirez surrendered to serve a prison sentence and was processed at Central Jail. (Pl. Dep. at 88, Ex. 1, ECF No. 66-1.) He passed through a low-dose x-ray body scanner. (*Id*. at 90.) He was then subject to a strip search. (*Id*.) When ordered to bend over, Mr. Ramirez complained of pain. (*Id*. at 90, 92, 96.) Because Plaintiff failed to comply with the search, jail staff sent him for a follow-up pelvic x-ray. (*Id*. at 90–91.) Plaintiff had to take two pelvic x-rays, given that the first one was apparently inconclusive. (*Id*. at 97.) A radiologist analyzed the x-rays and cleared Plaintiff, as did trained deputies. (*Id*. at 102.) He was booked into the jail. (*Id*. at 90–91, 102.)

**The January 4 Cell Search**

On January 4, 2023, law enforcement searched Mr. Ramirez's cellblock. (*Id*. at 106.) Mr. Ramirez was removed from his cell, handcuffed, taken to the yard, and subject to another strip search. (Pl. Dep. at 108, 110–11, Ex. 1.) As discussed in the joint statement of undisputed facts above, drugs were found in Mr. Ramirez's cell, on his cellmate, and in the cell next door. (ECF No. 70.) During the second strip search, Mr. Ramirez again failed to properly bend as instructed. (Pl. Dep. at 112–13, Ex. 1.) The jail staff once more requested a follow-up pelvic x-ray of Plaintiff. (*Id*. at 113.)

**Further X-Ray Review**

Before Plaintiff got x-rayed, Detective Kearney spoke to Mr. Ramirez directly. (*Id*. at 118; *see also* Kearney Dep. 123, Ex. 3, ECF No. 66-3.) Detective Kearney asked Plaintiff: "Do you want to give me what you have, or you want to play hardball?" (Pl. Dep. at 118, Ex. 1.) Mr. Ramirez told Detective Kearney that he was not concealing contraband. (*Id*.) Detective Kearney stated that he would send Plaintiff to the hospital and that, "You're

not going to like what they're going to do at the hospital." (*Id.*) When Plaintiff referenced CAT scans, Detective Kearney suggested instead an "anal cavity search and CAT scan." (*Id.* at 118, 120–21.) Upon hearing about the rectal examination, Plaintiff reflected, "And my – my attitude remained the same. It doesn't matter what you guys – I don't have nothing, you know." (*Id.*)

After speaking with Detective Kearney, Plaintiff agreed to undergo the x-rays of his pelvic area. (*Id.* at 122.) On January 4, as on January 3, Plaintiff received two x-rays. (ECF No. 70.) Detective Kearney, who was also reviewing the x-rays, requested the second x-ray on January 4. (Pl. Dep. at 122, Ex. 1.) Mr. Ramirez was cleared but shortly thereafter was told that he would be sent to Alvarado Hospital. (*Id.* at 123, 125, 128.)

**Transport to Alvarado Hospital**

Two sheriffs, Deputies Abrams and Rodriguez ("transportation deputies"), transported Plaintiff to Alvarado Hospital. (*Id.* at 129.) En route, one of the sheriffs told Plaintiff that he does not work in the jail, but that he was there because of staff shortages. (*Id.*) One of them also told Plaintiff it was his first day on the job. (*Id.*)

**At Alvarado Hospital**

Deputies Abrams and Rodriguez remained with Mr. Ramirez at Alvarado Hospital. (*Id.* at 154.) In the hospital emergency room, Plaintiff was handcuffed to a bed, surrounded by a partition. (*Id.* at 131.)

A female doctor mentioned that Plaintiff would receive a rectal examination.[1] (*Id.* at 140.) Either Deputy Abrams or Rodriguez told Plaintiff, "Oh, f***. . . that's kind of messed up," and "I feel sorry for you." (*Id.* at 140–41.)

Plaintiff then spoke with a male doctor, with "salt-and-pepper" hair, about doing a CAT scan instead.[2] (*Id.* at 142–43.) The male doctor told Plaintiff that a CAT scan was a

[1] The female doctor is presumptively Dr. Lopez, although not identified as such in the deposition.

[2] Besides the description of his hair, the male doctor is not identified further, and he is not a party in this suit.

viable alternative and that "we can actually do a CAT scan instead." (*Id*. at 143.) Medical staff began moving Plaintiff for a CAT scan.[3] (*Id*. at 147.)

But Detective Kearney was present and intervened: "Hey, what are you guys doing[?]" The male doctor told Detective Kearney that they were going to perform a CAT scan. Detective Kearney responded: "No. No. No. You guys need to do a cavity." (*Id*. at 143, 147, 153.)

Detective Kearney then had a discussion with the male doctor. (*Id*. at 149.) After that conversation, the female doctor came back into the room and informed Plaintiff they were proceeding with a rectal search. (*Id*. at 150–51.) Plaintiff said, "What the f***? That's some bulls***." (*Id*.) To which the female doctor responded, "Well, at least it's a female and not a male." (*Id*.) Around this time, the male doctor told Plaintiff: "I've got orders to do the cavity search, and that's what we're going to do." (*Id*. at 151.) One of the transportation deputies said "D***, they're – they're really doing this." (*Id*. at 151–52.)

Detective Kearney then came back into the room, as the female doctor was preparing for the rectal examination, and told Plaintiff, "Remember, you wanted to play hardball." (*Id*. at 153.) Detective Kearney then left, and the female doctor and the male doctor remained in the partitioned space. (*Id*. at 154, 158.)

**The Rectal Examination**

Plaintiff testified that the female doctor got "gloves" and "some lube so it wouldn't hurt me." (*Id*. at 155.) He further testified that he called her a "b****" and that she responded, "It's going to take a while. I'm going to go drink a tall can before I go up you're [sic] a**." (*Id*. at 155–56.) Before the examination, Plaintiff was "complaining about it." (*Id*. at 158.)

---

[3] Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Here, the parties do not object to the material cited, thus the Court considers the statements of the male doctor for purposes of summary judgment.

The female doctor then told Plaintiff that "she was going to put three fingers in" his rectum; Plaintiff testified that she did so for approximately thirty seconds. (*Id*. at 160–62.) Plaintiff stated that he was "bleeding from my anal" for ten days afterwards. (*Id*. at 164–65.)

The cavity search revealed no contraband. (*Id*. at 165.) The hospital subsequently performed a CAT scan, which was also negative. (*Id*.)

**Return to Custody**

Within hours of returning to Central Jail, the County transferred Plaintiff to the George Bailey Detention Facility. (*Id*. at 171.) He received another strip search there. (*Id*. at 174.) A dog walked behind the inmates and "stopped" in front of Plaintiff, "sniffed" Plaintiff, and "kept pushing, came back" and then "sat" down behind Plaintiff; everyone got housed except for Plaintiff. (*Id*. at 173.) He told the deputies conducting the search: "[I]f I strip out, you're going to see my f***ing a**hole bleeding, and you're going to believe I have something, and I don't." (*Id*. at 174)

Plaintiff states that he bled from his rectum for ten days following the procedure. (*Id*. at 164–65.) His rectum felt "different." (*Id*. at 176–77.) With only two pairs of underwear available, he washed each privately in his cell. (*Id*. at 176.) Plaintiff described the examination as "traumatic" and "a big event, like in [his] life" he will not forget. (*Id*. at 181.)

## II. LEGAL STANDARDS

### A. Summary Judgment

A court's role at summary judgment "is to isolate and dispose of factually unsupported claims or defenses" so that they are "prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 327 (1986). A court thus appropriately grants summary judgment if the moving party shows that there is no genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A "material" fact "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248

(1986). And a "genuine" issue of material fact means "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

At summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. The Court steers clear of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts." *Id*. And the Court need only consider the materials cited from the record. *See* Fed. R. Civ. P. 56(c)(3).

The burden-shifting scheme defines the motion for summary judgment. *See* Fed. R. Civ. P. 56(c). The party that moves for summary judgment initially carries the burden. *See Celotex*, 477 U.S. at 325; *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). To satisfy this burden, the movant can either: (1) present evidence that negates an essential element of the nonmovant's case, or (2) demonstrate that the nonmovant did not sufficiently support an essential element, on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322–23.

Assuming the movant meets his burden, the nonmovant must "go beyond the pleadings" and by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324. The nonmovant cannot rely on "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986).

**B. Qualified Immunity**

Defendants seek qualified immunity on the § 1983 claims. Qualified immunity protects officers from going to trial on "insubstantial lawsuits." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

To determine whether an officer should receive qualified immunity, a court considers: (A) "whether a constitutional right would have been violated on the facts alleged," and (B) "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). A court can take these questions in any order. *Pearson v. Callahan*, 555

U.S. 223, 236 (2009). And a court can skip the constitutional question, regarding whether a constitutional right would have been violated on the facts alleged. *Id.*

Clearly established means the "contours of the right" were "sufficiently clear" so that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, the law should place the existence of a right "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And it should affirm the right "under similar circumstances." *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (citation omitted). Nevertheless, the qualified immunity analysis does not require a case "directly on point." *Ashcroft*, 563 U.S. at 741. In a rare, "obvious" case, the violation of a constitutional right may be clear even without similar circumstances. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

The Supreme Court's reliance on clearly established law for the qualified immunity analysis balances two competing values. The Court considered that "bare allegations of malice" could inappropriately "subject government officials [] to the costs of trial" with its attendant implications of "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow*, 457 U.S. at 817–818. At the same time, when an official could be fairly said to know that "the law forbade conduct," he should be made to answer for the transgression. *Id*. at 818. Thus, "[r]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law," sought to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id*.

When analyzing a qualified immunity defense at summary judgment, the court must draw reasonable inferences in favor of the non-movant. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014). And "[i]t is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018) (citation omitted).

## III. ANALYSIS

Below, the Court first addresses County Defendants statutory exhaustion argument. The Court next turns to the substantive points; Plaintiff makes several federal and state law claims against Defendants. In its analysis, the Court addresses the claims against: (1) Detective Kearney, (2) Deputies Abrams and Rodriguez, (3) the County of San Diego, and (4) Dr. Lopez. The Court concludes its analysis with a discussion of punitive damages.

### A. Exhaustion

County Defendants argue that Plaintiff did not fully exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a). *See Royzman v. Lopez*, No. 21-CV-1429-BAS-AHG, 2023 WL 2026537, at *4 (S.D. Cal. Feb. 15, 2023) (noting that the failure to exhaust is an "affirmative defense"). Specifically, County Defendants argue that while Plaintiff submitted an initial grievance, the grievance was incomplete because Plaintiff did not respond to the request for clarification and did not appeal the process.

The Prison Litigation Reform Act of 1995 ("PLRA") mandates that "an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 578 U.S. 632, 635 (2016) (quoting 42 U.S.C. § 1997e(a)). The "administrative remedies" to exhaust are defined by the correctional institution's regulations. *See id*. at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

The PLRA imposes an exhaustion requirement for a couple of reasons, namely: "in order to give an agency the opportunity to correct its own mistakes before being dragged into federal court and in order to promote greater efficiency and economy in resolving claims." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015).

The Supreme Court has clarified that an inmate is required to exhaust those, but only those, grievance procedures that are actually "capable of use" to obtain "some relief for the action complained of." *Ross*, 578 U.S. at 643 (quotation omitted). The justification for this rule hinges on the statutory term "available." *Id*. In short, a plaintiff "must exhaust available remedies, but need not exhaust unavailable ones." *Id*. at 642.

Three situations indicate exhaustion is unavailable. *Id*. at 643. First, when "(despite what regulations or guidance materials may promise)," an administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. Second, when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use," in other words, "no ordinary prisoner can discern or navigate it." *Id*. at 643–44. Third, when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 644.

Here, County Defendants have not met their burden. Based on the testimony of the County Defendants' Rule 30(b)(6) designee, Arturo Bernal, exhaustion of Plaintiff's grievance process would have led to a dead end.

When asked by Plaintiff's attorney: "For Mr. Ramirez personally, there's no remedy available to him through the grievance process?," Mr. Bernal stated, "I do not think so." (Bernal Dep. at 43, Ex. 7, ECF No. 66-7.) Further testimony from Mr. Bernal in the record explains why; Plaintiff filed a "personnel" complaint, and thus the grievance process and attendant appellate exhaustion were unavailable to him. And the County of San Diego labeled Mr. Rameriz's document as a personnel complaint, writing: "Complaint against Staff." (Ex. 14, ECF No. 66; Bernal Dep. at 98–99, Ex. 7.)

Mr. Bernal affirms the unavailability of the administrative procedure for personnel complaints:

> Q: But if the grievance is about staff discipline or a complaint about staff, it's not subject to the procedures set out in the grievance procedure policy; right?
>
> A: They have no say in the staff discipline, essentially, yes.
>
> […]
>
> Q: Okay. And that means, similarly, if you submit—that nobody is stopping you from submitting a grievance form on these subjects, and if you—if it is denied or not—you don't get a

response that's to your satisfaction, nobody is going to stop you from submitting a follow-up grievance form about it, but it's not going to be handled as an appeal, is it?

A: Correct.

(Bernal Dep. 88, Ex. 7.)

In Reply, County Defendants do not address the Rule 30(b)(6) designee's testimony but, instead, dispute the appropriate remedy. Namely, County Defendants state that the "appropriate remedy would be a factual determination by the Court." Further, County Defendants seek "an evidentiary hearing, as to exhaustion under the PLRA." (County Reply 2:3–6, ECF No. 71); *cf. Perttu v. Richards*, 605 U.S. 460, 479 (2025) (determining that a jury should decide exhaustion where the plaintiff's First Amendment constitutional claim was "intertwined" with the PLRA exhaustion procedure). But they have failed to create an issue of material fact in response to Mr. Bernal's testimony. When asked about the evidentiary hearing at the summary judgment hearing, County Defendants declined to defend their position. (ECF No. 76.)

Accordingly, viewing the evidence in the light most favorable to Plaintiff, Defendants are not entitled to summary judgment on the exhaustion defense.

**B. Defendant Detective Kearney**

Plaintiff raises federal constitutional claims against Detective Kearney, along with several state law claims.

**1. Fourth Amendment**

The Fourth Amendment protects against unreasonable searches and seizures.[4] *See* U.S. Const. amend. IV. The Fourth Amendment analysis deviates for inmates; while

[4] In the original complaint, Plaintiff alleged excessive force under the Fourth Amendment against all Defendants. (ECF No. 1.) The Honorable Michael M. Anello dismissed this cause of action against Defendants because Plaintiff is not a pre-trial detainee. (ECF No. 20 at 8–9.) Nevertheless, Plaintiff realleged the claim in the amended complaint without curing the deficiency. (ECF No. 25.) The Fourth Amendment excessive force claim is thus not discussed by the Court at summary judgment. And, at the summary judgment hearing, the parties agreed that dismissal of this claim is appropriate. (ECF No. 76.)

"prisons are not beyond the reach of the Constitution," it is "also clear that imprisonment carries with it the circumscription or loss of many significant rights." *See Hudson v. Palmer*, 468 U.S. 517, 523–24, 526 (1984) (holding that prisoners have no Fourth Amendment expectation of privacy in their cells); *Bell v. Wolfish*, 441 U.S. 520, 558 (1979) (holding that visual body cavity searches of pretrial detainees satisfied the Fourth Amendment). The "curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities[.]" *Hudson*, 468 U.S. at 524 (citation omitted).

In the Ninth Circuit, "incarcerated prisoners retain a limited right to bodily privacy." *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988). Digital cavity searches of incarcerated individuals are constitutional so long as they are reasonable. In particular, a rectal search complies with Fourth Amendment reasonableness where (1) prison officials had reasonable cause to search the inmate; (2) the search served a valid penological need; and (3) the search was conducted in a reasonable manner.[5] *See Wiley v. Serrano*, 37 F. App'x 252, 253 (9th Cir. 2002) (affirming summary judgment in the government's favor regarding an inmate's Fourth and Eighth Amendment constitutional challenges to a digital rectal cavity search). These *Wiley* factors are drawn from established Ninth Circuit reasoning. *See Tribble v. Gardner*, 860 F.2d 321, 325 (9th Cir. 1988) (discussing routine digital rectal searches whenever inmate moved into secure housing unit within maximum security prison); *Vaughan v. Ricketts*, 950 F.2d 1464, 1468–69 (9th Cir.1991) (discussing digital rectal searches of inmates conducted to detect explosives) (*Vaughan II*); *Vaughan v. Ricketts*, 859 F.2d 736 (9th Cir. 1988) (same) (*Vaughan I*).

---

[5] Pretrial detainees occupy a different constitutional position than convicted prisoners for Fourth Amendment purposes. *See, e.g.*, *United States v. Fowlkes*, 804 F.3d 954, 961 (9th Cir. 2015) ("[W]hile visual cavity searches that do not require physical entry into a prisoner's body are generally permissible without a warrant during the jail intake process, physical cavity searches generally are not."); *George v. Edholm*, 752 F.3d 1206, 1218–19 (9th Cir. 2014) (addressing the standard for physical body cavity searches of pretrial detainees); *United States v. Cameron*, 538 F.2d 254, 255–56 (9th Cir. 1976) (discussing a rectal examination as well as other procedures on an individual stopped at San Ysidro, California port of entry).

**a. Unreasonable Search**

County Defendants first argue that Dr. Lopez—a private physician—made an independent medical decision to perform the rectal examination; thus, her conduct cannot be attributed to the Government for Fourth Amendment purposes.

The Fourth Amendment is not so easily circumvented. "The fact that the Government has not compelled a private party to perform a search does not, by itself, establish that the search is a private one." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 615 (1989). The Fourth Amendment's protections reach beyond searches conducted directly by the Government to encompass searches attributable to the Government. *See George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014) ("Police officers may not avoid the requirements of the Fourth Amendment by inducing, coercing, promoting, or encouraging private parties to perform searches they would not otherwise perform.").

Here, reading the facts in the light most favorable to Plaintiff, Detective Kearney ordered that a rectal examination be performed.[6] (Pl. Dep. at 143, 147, 153, Ex. 1.) Accordingly, Dr. Lopez's rectal examination can be attributed to the Government for Fourth Amendment purposes.

In the alternative, County Defendants argue that the rectal examination was reasonable under the *Wiley* three-part analysis. The Court addresses each prong in turn.

*Reasonable Cause*

As a matter of law, the officers had reasonable cause for the rectal examination. *See United States v. Ramsey*, 431 U.S. 606, 612 (1977) (defining "reasonable cause," as used in a statute, as "a practical test which imposes a less stringent requirement than that of

[6] At the summary judgment hearing, Plaintiff's attorney repeatedly suggested that Detective Kearney was the first to raise the option of a digital cavity search, but that is not so, reading the facts in the light most favorable to Plaintiff. According to Plaintiff's deposition, when Plaintiff arrived at Alvarado Hospital with the transportation deputies, Dr. Lopez mentioned that Plaintiff would receive a rectal examination. (Pl. Dep. at 133, Ex. 1, ECF No. 66-1.) Nevertheless, attribution applies given Detective Kearney's alleged involvement in demanding a rectal examination.

'probable cause' imposed by the Fourth Amendment as a requirement for the issuance of warrants").

Here, the undisputed facts and the facts read in the light most favorable to Plaintiff both support reasonable cause. Plaintiff was the most recent arrival to the module. Upon admission, Plaintiff did not bend over properly during a visual cavity search and required two x-rays before admittance to housing. The next day, officers found heroin and a pick to divide drugs in Plaintiff's cell. Officers found heroin on Plaintiff's cellmate. A search of the cell next door to Plaintiff's cell revealed two bindles of heroin. Inside these bindles were handwritten notes, referencing "J from Logan." Mr. Ramirez was known by the moniker of "Jester." And Plaintiff was once more uncooperative during a visual cavity search, which required further x-ray screenings. Finally, Detective Kearney, when reviewing the x-rays, identified what he believed to be hidden narcotics in the pelvic area. The specificity and number of facts in the record suffices for reasonable cause. *See, e.g.*, *Wiley*, 37 F. App'x at 253 (finding reasonable cause to search the plaintiff's rectum given corroborated evidence that the plaintiff was dealing drugs while in prison and prisoners often hide contraband in bodily cavities).

Accordingly, no reasonable jury could find that County Defendants lacked reasonable cause to suspect Plaintiff concealed contraband. *See Green v. Hallam*, 105 F. App'x 858, 861–62 (7th Cir. 2004) ("Given the broad discretion afforded prison officials in prison management, this court will not second-guess the reasonableness of the prison's need to conduct a search under the circumstances.").

*Valid Penological Need*

As a matter of law, investigating the smuggling of narcotics into prison serves a legitimate penological interest. *See Hudson*, 468 U.S. at 526–27 ("[Officers] must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today[.]"); *see also Thompson v. Souza*, 111 F.3d 694, 701 (9th Cir. 1997) (holding that strip searches of inmates—singled out for having prior involvement with illicit drugs—served the legitimate

penological interest of "keeping drugs out of the prison") (citation modified); *Friend v. Kolodzieczak*, 923 F.2d 126, 128 (9th Cir. 1991) (restricting inmates' personal religious items as logically connected to the penological interest in limiting "the means by which inmates may obtain drugs"). And it is the plaintiff's burden to rebut a valid penological search. *See Michenfelder*, 860 F.2d at 333.

Here, where County Defendants claim a valid penological interest in preventing narcotics from entering the facility, Plaintiff cannot overcome his burden. *See Wiley*, 37 F. App'x at 253–54 (finding a valid penological purpose in preventing drugs from entering the administrative segregation unit). For support, Plaintiff argues that Detective Kearney's alleged conflicting testimony shows Detective Kearney's "consciousness of guilt." (County Opp'n 11:11–12, ECF No. 65.) Such speculation is insufficient to support a triable issue of fact at summary judgment.

It is a closer legal question whether Detective Kearney's comment, "You wanted to play hardball," impacts the validity of the penological purpose. The Court concludes it does not. Plaintiff cannot overcome the valid penological purpose because officers checked more than Plaintiff's rectal cavity.

In contrast, in *Tribble*, the plaintiff produced substantial probative evidence that the rectal search was conducted for purposes unrelated to security considerations based in part on a report that found no effort was made to search the plaintiff's clothing, other body cavities, hair, or even hands. 860 F.2d at 323, 326 ("One can draw an inference that a search limited to the rectal cavity may be done for punitive purposes because prisoners can smuggle contraband into the IMU by concealing it elsewhere."); *see Kennebrew v. Peterson*, 967 F.2d 587 (9th Cir. 1992) (denying summary judgment where the plaintiff stated that "no search was performed on his clothing or other body parts during the rectal search").

Here, Plaintiff confirms that during the strip search, officers checked his entire body, including his ears: "I stripped-out, followed the orders – check my hair, my ears, my mouth, swat and cough, got naked." (Pl. Dep. 112:17–18, Ex. 1; *see also* Costelow Dep. 43:2–9,

Ex. B, ECF No. 60-5.) And established precedent requires more than an officer's comments alone to rebut a valid penological purpose. Accordingly, no reasonable jury could find that County Defendants lacked a valid penological need in conducting a rectal examination to keep narcotics out of prison.[7]

*Reasonable Manner*

As a matter of law, the manner of the search was reasonable. *See Wiley*, 37 F. App'x at 254 (finding the search—which took place in the infirmary emergency room by a doctor who used a lubricated plastic scope— was conducted in a reasonable manner, even though the plaintiff complained that the search caused pain). To decide whether the rectal examination was conducted in a reasonable manner, a court should look to issues of privacy, hygiene, the training of the individual who performed the search, and the place in which the search was conducted. *See Vaughan I*, 859 F.2d at 741.

Here, Plaintiff was taken to a private hospital and taken to a partitioned space, where a licensed doctor, with the oversight of other medical professionals, performed the rectal examination using gloves and lubricant, and examined the anus beforehand. (Pl. Dep. 131, 155, Ex. 1; *see also* Lopez Dep. 78:20–79:10, Ex. I, ECF No. 60-12). The facts, read in the light most favorable to Plaintiff, show privacy, hygiene, training, and location were satisfied in taking Mr. Ramirez to Alvarado Hospital for the examination. *Cf. Vaughan I*, 859 F.2d at 738 (categorizing the manner of a rectal examination as unreasonable, where the plaintiff alleged that "correctional medical assistants untrained in involuntary rectal cavity searches conducted them on a table in an open hallway, within view of prison personnel and some inmates"); *Huguez v. United States*, 406 F.2d 366, 382 (9th Cir. 1968) (categorizing as unconstitutional a rectal search, where "[i]nstead of the use of a medical technique by a physician in a hospital environment according to accepted medical practices," the facts indicated "the use of a rudimentary medical technique" in "the non-

[7] The Court also notes that, in addition to a valid penological need, there is a valid medical concern when officers have reasonable cause to believe an inmate swallowed or inserted narcotics into his body.

antiseptic and non-hygienic atmosphere of a baggage room”). Accordingly, no reasonable jury could find that the rectal examination lacked a reasonable manner.

Thus, although determining that Dr. Lopez’s examination can be attributed to the Government, all three considerations of the *Wiley* analysis have been satisfied as a matter of law. Nor is the Court inclined insert a requirement that reasonableness requires the least intrusive alternative. *See City of Ontario, Cal. v. Quon*, 560 U.S. 746, 763 (2010) (“[The Supreme] Court has repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment.” (citation modified)). The Court thus grants summary judgment in County Defendants’ favor as to the Fourth Amendment claim against Detective Kearney.[8]

**2. Eighth Amendment**

The Eighth Amendment prohibits the infliction of “cruel and unusual punishments” on those convicted of crimes and applies to the States through the Fourteenth Amendment’s Due Process Clause. *See Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991). An Eighth Amendment claim should not go to the jury unless “it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain.” *Whitley v. Albers*, 475 U.S. 312, 322 (1986). In the Ninth Circuit, as stated in dicta, a rectal examination conducted for purposes other than security considerations may constitute cruel and unusual punishment under the Eighth Amendment. *See Tribble*, 860 F.2d at 325 n.6.

Here, as explained in the Fourth Amendment analysis, as a matter of law, the Court cannot say mere words indicate that the rectal examination was conducted for purposes other than security considerations. Moreover, Detective Kearney is entitled to qualified immunity on the Eighth Amendment claim. *See Harlow*, 457 U.S. at 818 (“If the law at

[8] For similar reasons explained in Section (III)(B)(2) below, the Court also finds qualified immunity applies to Detective Kearney’s Fourth Amendment claim. Plaintiff fails to identify clearly established law that an officer—suspecting someone of concealing contraband in his body—could not demand a rectal cavity search at a hospital.

that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."). Assuming the Eighth Amendment right were clearly established based on footnote 6 in *Tribble*, still, case law does not proscribe as wanton an officer's demand for a rectal examination of an inmate suspected of concealing contraband. And the Court cannot weigh Detective Kearney's subjective state of mind for qualified immunity purposes. *See F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1316 (9th Cir. 1989) ("Immunity turns on the objective reasonableness of the official's conduct, not on a showing of subjective good faith.").

Plaintiff's first response to the qualified immunity argument is that qualified immunity may no longer exist. (County Opp'n 14:22.) Next, Plaintiff asserts that there are outstanding questions of material fact. (County Opp'n 15:18). Turning to the substantive arguments, the Court does not find an exceptional, "obvious" violation of a constitutional right. (County Opp'n 16:20); *cf. Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (finding an obvious constitutional violation in placing an inmate in a cell with a "clogged drain in the floor to dispose of bodily wastes," so that the inmate "held his bladder for over 24 hours, but he eventually (and involuntarily) relieved himself, causing the drain to overflow and raw sewage to spill across the floor").

To the extent Plaintiff cites to the Ninth Circuit cases *Vaughan*, *Fowlkes*, *Tribble*, and *Bell*, the cases do not articulate a clearly established right under similar circumstances.

- *Vaughan*, 859 F.2d at 738: Rectal examination, by assistants untrained in rectal cavity searches, conducted on a table in open view – ("Vaughan alleges that correctional medical assistants untrained in involuntary rectal cavity searches conducted them on a table in an open hallway, within view of prison personnel and some inmates.").
- *Fowlkes*, 804 F.3d at 959: Rectal examination, by officers, conducted in a jail in front of multiple other officers – ("At intake, the officers strip searched Fowlkes in the jail's strip search room, a five by six enclosure with three

concrete walls and an opening in the fourth wall. Five officers observed the strip search, including Officer Jeffrey Harris and Sergeant Michael Gibbs, who brought along his taser, gloves and 'assistance' in the form of additional officers because he thought Fowlkes might have drugs.").

- *Tribble*, 860 F.2d at 323: Rectal examination, by physician assistant, conducted on every inmate prior to placement in the Intensive Management Unit – ("It is undisputed that the search occurred pursuant to policy, and was not based upon a suspicion that Tribble had secreted any item in his rectum.").
- *Bell*, 441 U.S. at 558: Visual cavity search conducted on every inmate after a contact visit – ("Inmates at all Bureau of Prison facilities, including the MCC, are required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution.").

Other than dicta in footnote 6 of *Tribble*, the case law referenced above does not discuss the Eighth Amendment right, and certainly does not discuss it under similar circumstances. The Court, moreover, will not look to case law beyond the Supreme Court and Ninth Circuit to clearly establish a constitutional right sufficient to place an officer on notice in this district. *See Russell v. Lumitap*, 31 F.4th 729, 737 (9th Cir. 2022) ("The precedent must be controlling—from the Ninth Circuit or the Supreme Court—or otherwise be embraced by a consensus of courts outside the relevant jurisdiction." (citation modified)).

Accordingly, the Court grants summary judgment in County Defendants' favor as to the Eighth Amendment claim against Detective Kearney. Plaintiff cannot support through evidence that the rectal examination was conducted for purposes other than security considerations, and, in any case, Detective Kearney is entitled to qualified immunity.

**3. State Law Claims**

Plaintiff raises several state law claims.

**a. Battery**

County Defendants move for summary judgment on Plaintiff's battery claim.

For a battery claim, the plaintiff must show: (1) the defendant touched or caused to be touched with the intent to harm or offend him; (2) the plaintiff did not consent to the touching; (3) the plaintiff was harmed or offended by the defendant's conduct; and (4) a reasonable person in the plaintiff's position would have been offended by the touching. *See So v. Shin*, 212 Cal. App. 4th 652, 669 (2013).

Here, Detective Kearney did not perform the digital cavity search. Assuming Dr. Lopez committed battery,[9] Plaintiff's amended complaint alleges that Detective Kearney conspired with and aided and abetted Dr. Lopez's tortious conduct.[10] (Am. Compl. ¶ 249, ECF No. 25.) At the summary judgment hearing, Plaintiff suggested that Detective Kearney and Dr. Lopez just had to agree on what acts would be performed and if the acts constituted battery. (ECF No. 76.) But civil conspiracy and aiding and abetting are theories of liability that require an intent threshold that Plaintiff has failed to pass at the summary judgment stage.

The Court first discusses the elements of civil conspiracy and then the elements of aiding and abetting liability under California law. A claim for civil conspiracy entails three elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct. *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995). Importantly, the "conspiring defendants must [] have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose." *Id.* at 1582.

---

[9] Plaintiff brings a battery claim, rather than a medical battery claim, because he argues he withheld consent. *Cf. Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.*, 107 Cal.App.4th 1260, 1267 (2003) ("A typical medical battery case is where a patient has consented to a particular treatment, but the doctor performs a treatment that goes beyond the consent.").

[10] The Court notes that Plaintiff did not argue for conspiracy and/or aiding and abetting liability in its summary judgment briefing notwithstanding a single sentence: "The County [D]efendants conspired to cause the battery and thus intended the physical touching." (County Opp'n 23:24–25, ECF No. 64.)

Here, Plaintiff has failed to present evidence that Detective Kearney knew Dr. Lopez planned to batter Plaintiff or that Detective Kearney intentionally agreed to batter Plaintiff. Although Detective Kearney requested the rectal examination, that allegation is insufficient to establish intent for a civil conspiracy to commit the tort of battery.

Next, liability may also be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person. *Saunders v. Superior Ct.*, 27 Cal. App. 4th 832, 846 (1994). "As a general rule, one owes no duty to control the conduct of another[.]" *Fiol v. Doellstedt*, 50 Cal.App.4th 1318, 1325–26 (1996) (citation omitted).

Here, Plaintiff has failed to present evidence that Detective Kearney knew of Dr. Lopez's tortious conduct and gave substantial assistance or encouragement to Dr. Lopez's battery. Again, even if Detective Kearney demanded a rectal examination, that does not prove he aided and abetted tortious conduct.

Accordingly, the Court grants the motion for summary judgment in County Defendants' favor regarding the battery claim against Detective Kearney.

**b. Assault**

County Defendants move for summary judgment on Plaintiff's assault claim.

For an assault claim, the plaintiff must show: (1) the defendant acted, intending to cause harmful or offensive contact, or threatened to touch the plaintiff in a harmful or offensive manner; (2) the plaintiff reasonably believed he was about to be touched in a harmful or an offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) the plaintiff did not consent to the defendant's conduct; (4) the plaintiff was harmed; and (5) the defendant's conduct was a substantial factor in causing the plaintiff's harm." *See So v. Shin*, 212 Cal. App. 4th 652, 668−669 (2013). "Words alone are insufficient to find liability for assault." *Hernandez v. City of Napa*, No.

C-09-02782 EDL, 2009 WL 3429667, at *9 (N.D. Cal. Oct. 22, 2009) (citing Restatement (Second) of Torts § 31).

Here, Plaintiff does not allege a conspiracy or aiding and abetting theory of liability. Without relying on Dr. Lopez's conduct, Plaintiff fails to provide evidence that Detective Kearney acted with the intent to cause Plaintiff harmful or offensive contact or threatened to touch Plaintiff in a harmful or offensive manner. *See, e.g.*, *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004) ("The undisputed evidence indicates that Austin was not fearful of Williams, and at the time of the alleged indecent exposure, Williams was separated from Austin by the walls and window of the control booth."). Moreover, the Court takes into consideration that Detective Kearney's request for the rectal examination was constitutionally permissible. In other words, Detective Kearney cannot be liable for civil assault for demanding a constitutionally reasonable digital cavity search. *See, e.g.*, *Worthy v. City of Berkeley*, 573 F. Supp. 3d 1398, 1415 (N.D. Cal. 2021), *order clarified*, No. 20-CV-05558-EMC, 2021 WL 5758887 (N.D. Cal. Dec. 3, 2021) ("Because police officers are permitted to use reasonable force to effectuate an arrest, liability for civil assault may only arise if the assault resulted from a police officer's use of unreasonable force.").

Accordingly, the Court grants the motion for summary judgment in County Defendants' favor regarding the assault claim against Detective Kearney.

**c. Sexual Battery**

County Defendants move for summary judgment on Plaintiff's sexual battery claim.

For a sexual battery claim, the plaintiff must show: (1) The defendant intended to cause a harmful or offensive contact with the plaintiff's anus, and a sexually offensive contact with the plaintiff resulted; (2) The plaintiff did not consent to the touching; and (3) The plaintiff was harmed or offended by the defendant's conduct. *See* Cal. Civ. Code § 1708.5; *see also Angie M. v. Superior Court*, 37 Cal. App. 4th 1217, 1225 (1995).

Here, Plaintiff does not allege a conspiracy or aiding and abetting theory of liability. And Detective Kearney did not perform the rectal examination. *See Pina v. Cnty. of Los Angeles*, No. CV 18-8149 DMG (PLAx), 2020 WL 13588159, at *9 (C.D. Cal. Jan. 2,

2020) ("Without any evidence or claim of physical contact between Scotti and Rodriguez, she cannot sustain a sexual battery claim against him.").

Accordingly, the Court grants the motion for summary judgment in County Defendants' favor regarding the sexual battery claim against Detective Kearney.

**d. Bane Act**

County Defendants move for summary judgment on Plaintiff's Bane Act claim, under California Civil Code § 52.1.

The Tom Bane Civil Rights Act states, in relevant parts: "If a person […] interferes by threat, intimidation, or coercion, […] with the exercise or enjoyment by any individual […] of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state," that individual may bring a civil action for damages. Cal. Civ. Code §§ 52.1(b), (c).

Here, Plaintiff cannot bring a Bane Act claim because there is no surviving underlying federal or state right.

Accordingly, the Court grants the motion for summary judgment in County Defendants' favor regarding the Bane Act claim against Detective Kearney.

**e. Negligence**

County Defendants move for summary judgment on Plaintiff's negligence claim.

Negligence under California law requires the following: (1) a legal duty to use due care; (2) a breach of such legal duty; and (3) that the breach was a proximate or legal cause of the resulting injury. *See Ladd v. County of San Mateo*, 12 Cal. 4th 913, 917 (1996). "Except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 628–29 (2013); Gov. Code § 820(a).

Here, Plaintiff does not allege a conspiracy or aiding and abetting theory of liability. What duty, then, did Detective Kearney owe Mr. Ramirez? *See Jones v. Cnty. of Los Angeles*, No. CV 11-02851 SJO (JCGx), 2011 WL 13152515, at *5 (C.D. Cal. Sept. 30,

2011) ("Plaintiffs may not proceed to trial on their negligence claim. They are unable to point to a duty and, without a duty, their negligence claim fails as a matter of law."). To the extent that Detective Kearney had a duty to use reasonable care to prevent harm or injury to Mr. Ramirez, the Court cannot find that preventive duty in the case law. And the analysis above indicates that Detective Kearney's demand for a rectal examination was constitutionally reasonable.

True, the absence of a constitutional violation does not always establish that a defendant exercised due care under a negligence standard. *See Alves v. Cnty. of Riverside*, 135 F.4th 1161, 1172 (9th Cir. 2025). In *Alves*, the Ninth Circuit held that a jury could find that an officer acted negligently in restraining and handcuffing an individual even without finding a Fourth Amendment violation, due in part to the differing standards governing state negligence and federal excessive force claims. *Id*. But the Court cannot determine whether different standards govern here without identifying the basis of the negligence claim. Again, the Court fails to see what other duty Detective Kearney allegedly breached. *Cf. Hayes*, 57 Cal. 4th at 629 ("This court has long recognized that peace officers have a duty to act reasonably when using deadly force.").

Accordingly, the Court grants the motion for summary judgment in County Defendants' favor regarding the negligence claim against Detective Kearney.

**f. Intentional Infliction of Emotional Distress**

County Defendants move for summary judgment on Plaintiff's intentional infliction of emotional distress ("IIED") claim.

For an IIED claim, the plaintiff must show: (1) that the defendant's conduct was outrageous and that the defendant intended to cause emotional distress; or (2) that the defendant acted with reckless disregard of the probability that the plaintiff would suffer emotional distress, knowing that the plaintiff was present when the conduct occurred, that the plaintiff suffered severe emotional distress, and that the defendant's conduct was a substantial factor in causing the plaintiff's severe emotional distress. *See Hughes v. Pair*, 46 Cal. 4th 1035, 1050–51 (2009) ("A defendant's conduct is 'outrageous' when it is so

'extreme as to exceed all bounds of that usually tolerated in a civilized community."). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery[.]" *Fuentes v. Perez*, 66 Cal. App. 3d 163, 172 (1977).

Here, Plaintiff fails to raise a triable issue of fact with regard to the extreme and outrageous element. No reasonable jury could say Detective Kearney's actions go beyond all possible bounds of decency, especially where Detective Kearney's actions are constitutionally reasonable. *See Dean v. Sausalito-Marin City Sanitary Dist.*, 95 F.3d 1157 (9th Cir. 1996) (affirming the district court's grant of summary judgment on the intentional infliction of emotional distress claim where "the actions that form the basis for [the plaintiff's claim] are not 'extreme and outrageous'").

Accordingly, the Court grants the motion for summary judgment in County Defendants' favor regarding the IIED claim against Detective Kearney.

**C. Defendants Deputy Abrams and Deputy Rodriguez**

Plaintiff raises federal constitutional claims against Deputies Abrams and Rodriguez—the transportation deputies—along with several state law claims.

**1. Fourth Amendment**

Plaintiff argues that the transportation deputies are liable under the Fourth Amendment given "obligations to intervene." (County Opp'n 9:20–21.) Plaintiff addresses this argument with one sentence in its opposition brief, citing *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *aff'd in part, rev'd in part*, 518 U.S. 81 (1996). (*Id.*) Footnote 25 from *Koon* states, in relevant part: "Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Id*. This case is different from *Koon*, however. The law does not impose such a duty on an officer in relation to a medical doctor at a hospital. (*See also* Rognlien-Hood Decl. ¶ 7, Ex. L, ECF No. 60-15) ("Once an individual is referred to an outside hospital for treatment, the jails have no control over what procedures are performed or how the patient is treated.").)

Further, imposing a duty to intervene on these facts would stretch the case law beyond its rational. At oral argument, Plaintiff stated that the transportation deputies knew Mr. Ramirez had normal vitals and there was no medical emergency.[11] (ECF No. 76.) But transportation deputies are not medical doctors; in other words, they cannot be tasked to know whether Plaintiff faced a medical emergency. Cases like *Koon* impose a duty to intervene where one officer knows of another officer's violation because the officers received the same training and share the same expertise. *See* 34 F.3d at 1447 n.25 (describing officers as "colleagues"). It would be inappropriate to require medically untrained officers to intervene during treatment provided by a medical doctor.

Even if there was such a constitutional right to intervene before a medical doctor performs a rectal examination, Plaintiff fails to identify case law demonstrating that such a constitutional right was clearly established.

Accordingly, given doubt of a constitutional obligation to intervene and lack of case law that clearly establishes such a right under similar circumstances, the transportation deputies are entitled to qualified immunity. Without support that the transportation deputies engaged in "abuse of office," allowing the action to proceed highlights the "social costs" of insubstantial lawsuits; such as, "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814. The Court grants the motion for summary judgment in County Defendants' favor as to the Fourth Amendment claim against the transportation deputies.

**2. Eighth Amendment**

When asked to specify the constitutional claims against the transportation deputies at the summary judgment hearing, Plaintiff identified the duty to intervene as the clearest. (ECF No. 76.) Plaintiff also suggested that the transportation deputies violated his Eighth

---

[11] For example, at the summary judgment hearing, Plaintiff suggested that the transportation deputies should have intervened by saying something along the lines of: Don't perform that examination. We're going to leave. (ECF No. 76.)

Amendment right—seemingly under a theory of deliberate indifference to health and safety, which sounds in failure to protect.[12]

Here, too, the transportation deputies are entitled to qualified immunity. Plaintiff fails to cite case law that clearly establishes that the transportation deputies can be liable for deliberate indifference to an inmate's health or safety, in violation of the Eighth Amendment's prohibition of cruel and unusual punishment, for failing to stop a medical doctor from performing a digital cavity search.[13] As in the analysis of the Eighth Amendment claim against Detective Kearney, the facts here do not support a rare, "obvious" constitutional violation.

Accordingly, given that Plaintiff fails to demonstrate deliberate indifference or provide case law that clearly establishes such a right under similar circumstances, the transportation deputies are entitled to qualified immunity. The Court thus grants the motion

---

[12] The Court briefly addresses why the Eighth Amendment deliberate indifference argument is an awkward fit under these facts. "Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Two requirements must be met. First, "the deprivation alleged must be, objectively, 'sufficiently serious,'" in other words, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* (citation modified). Second, in prison-conditions cases, the state of mind of the officer must be one of "deliberate indifference" to inmate health or safety. *Id.* (citation omitted). Deliberate indifference can be satisfied if "the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837 (specifying that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

Even if the two-step framework were to apply, no reasonable jury could find that transporting an individual to a hospital to receive a digital cavity search from a licensed doctor to detect drugs in his rectum constituted "conditions posing a substantial risk of serious harm." Moreover, no reasonable jury could conclude that the deputies knew Plaintiff faced an "excessive risk to health or safety" by transporting him to the hospital. Without evidence of conditions creating a substantial risk of serious harm or disregard for a known excessive risk to Plaintiff's health or safety, the deputies' alleged comments are insufficient to support an Eighth Amendment violation at the summary judgment stage.

[13] Moreover, Plaintiff's opposition brief states: "This was an anal rape occurring at [the deputies'] instructions." (County Opp'n 14:15–16, ECF No. 64.) Such a provocative statement cannot support a constitutional claim and lacks grounding in the evidentiary record. As admitted in the joint statement of facts, Deputies Abrams and Rodriguez did not make any recommendations or requests to medical staff about what examinations should be done. (ECF No. 70.) Further, Plaintiff's own testimony supports lack of instruction; when asked, "Do you feel like the deputies forced you to undergo this examination in any way?" Plaintiff responded, "Not the deputies[.]" (Plaintiff Dep. 201:3–5, Ex. 1.)

for summary judgment in County Defendants' favor as to the Eighth Amendment claim against the transportation deputies.

#### 3. State Law Claims

For similar reasons outlined in Section (III)(B)(3) above—regarding the state law claims against Detective Kearney—the Court dismisses all state law claims against the transportation deputies. Accordingly, the Court grants the summary judgment motion in County Defendants' favor regarding all state law claims against the transportation deputies.

### D. Defendant County of San Diego

In the original complaint, Plaintiff also alleged a *Monell* claim and several state law claims against the County of San Diego. (ECF No. 1.) The Honorable Michael M. Anello dismissed the *Monell* claim and state law claims with leave to amend, except for the Bane Act claim.[14] (ECF No. 20.) Given that the Court finds no underlying federal or state violation by Detective Kearney or the transportation deputies—and, as explained below, Dr. Lopez should not be considered a state actor—the Court grants summary judgment in County Defendants' favor as to the Bane Act claim against the County.

### E. Defendant Dr. Maria Lopez

Plaintiff raises federal constitutional claims and state law claims against Dr. Lopez.

#### 1. Federal Law Claims

Even though Dr. Lopez is a private party employed by Alvarado Hospital, Plaintiff argues that Dr. Lopez should be considered a state actor and thus liable under § 1983.

Liability under § 1983 requires a plaintiff to show both (1) deprivation of a right secured by the Constitution and laws of the United States and, at issue here, (2) that the deprivation was committed by a person acting under color of state law. *See Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011). "When addressing whether a private party acted under color of law," courts "start with the presumption that private

[14] Plaintiff's subsequent first amended complaint admits in ¶ 210 that the amended complaint does not add material allegations yet alleges once more all claims against the County of San Diego. (ECF No. 25.) The Court does not address the dismissed claims against the County at the summary judgment stage.

conduct does not constitute governmental action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999). Nevertheless, in certain circumstances, a private entity can be subject to liability under § 1983. *See Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 954 (9th Cir. 2008) (en banc).

The Supreme Court has identified four tests to determine whether a private party's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test.[15] *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012).

Relevant here, the "joint action" test asks, "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* at 1140 (citation modified) (finding joint action between Desert Palace, Inc. and Las Vegas Metro Police Department given a "system of cooperation and interdependence" between the entities). Put differently, joint action exists when the state has "so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989) (citation omitted); *see, e.g.*, *Jensen v. Lane Cnty.*, 222 F.3d 570, 575 (9th Cir. 2000) (finding the private entity and state entity to be "deeply intertwined" where, for example, "[the private entity] helps to develop and maintain the mental health policies of [the county facility]").

One can show joint action either "by proving the existence of a conspiracy" or "by showing that the private party was a willful participant in joint action with the State or its agents." *Tsao*, 698 F.3d at 1140 (citation modified).

---

[15] Just because the actions of a private individual can be attributed to the state—as discussed above in the Fourth Amendment analysis for Detective Kearney, Section III(B)(1)—does not mean that the private individual engaged in state action, a higher showing of intent is needed. *See George*, 752 F.3d at 1216 ("To hold Dr. Edholm personally liable as a state actor, George must establish not only that Edholm was induced to act as he did, but also that Edholm intended to assist Freeman and Johnson in obtaining evidence for their investigation.").

Here, Plaintiff's joint action theory fails. *See Stratton v. Buck*, 498 F. App'x 674, 676 (9th Cir. 2012) (affirming summary judgment in favor of a physician, regarding an Eighth Amendment constitutional violation claim brought by an inmate, in part because "there is no Ninth Circuit case law holding that emergency medical care is a traditionally and exclusively governmental function"). Plaintiff argues that a conspiracy exists because Detective Kearney allegedly ordered a rectal examination and Dr. Lopez performed one. It does not. A civil conspiracy requires shared intent to accomplish an unlawful end. *See Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) ("The defendants must have, by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in damage." (citation modified)).

Plaintiff points to no direct or circumstantial evidence in the record establishing such intent to harm Mr. Ramirez. As explained above, Detective Kearney's demand for a rectal examination was constitutionally reasonable. Plaintiff speculates that "[o]ne possible explanation for [Dr. Lopez's alleged] deviation from the standard of care would be if she intended to assist Kearney's investigation." (Lopez Opp'n 8:3–4, ECF No. 65.) Such inference alone cannot support a genuine issue of material fact at summary judgment.

To the extent Plaintiff argues that the private party was a willful participant in joint action with the State or its agents, that argument also fails. Plaintiff notes that "if the state 'knowingly accepts the benefits derived from unconstitutional behavior,' . . . then the conduct can be treated as state action." *Id*. The principle derives from *Burton v. Wilmington Parking Authority* where the Supreme Court found discrimination by a private restaurant, located in a publicly owned parking building, to constitute state action because the restaurant was operated as an integral part of the public building devoted to a public parking service, and the rent was paid to the state. *See* 365 U.S. 715, 725 (1961). Alvarado Hospital does not operate in a similar state-integrated manner to the private restaurant.

Accordingly, Dr. Lopez will not be considered to have engaged in state action. *See, e.g.*, *Skylstad v. Reynolds*, 248 F. App'x 808, 810 (9th Cir. 2007) (affirming grant of

summary judgment in the defendants' favor, regarding a suit brought by an inmate, given that the "defendants are a private hospital and two private doctors, and they were not acting under the color of state law"). Finding Dr. Lopez was not a state actor, the Court grants summary judgment in Dr. Lopez's favor on all federal constitutional claims against her. The Court now turns to the issue of consent.

Under California law, "[a] person who consents to an act is not wronged by it." Cal. Civ. Code § 3515; *see also* CACI No. 1302. Dr. Lopez testified that she received consent from Mr. Ramirez: "[H]e agreed to have the rectal exam, he agreed to have the C[A]T because he wanted to prove to them that he didn't have anything so he can be let go, and that's what we did." (Lopez Dep. 61:4–10, Ex. D.)

When specifically asked in the deposition, "what conversation you had with the female doctor about the fact that you didn't want to have a rectal exam," Plaintiff clarifies that he did not object to Dr. Lopez about the rectal examination:[16]

> Q: [S]o I know we had a lot of conversations about the fact that you didn't want to have a rectal examination. And some of those conversations were directed towards the deputies, and some of them were directed towards the medical staff. And so I'm trying to figure out specifically what conversation you had with the female doctor about the fact that you didn't want to have a rectal exam.
>
> A: Who I had told was the doctor. I told him, "Is there any way around this?" And he's the one that told me about the CAT scat [sic].
>
> Q: The male?

[16] Even if Plaintiff had objected to the male doctor with salt-and-pepper hair and Dr. Lopez, she does not dispute that Plaintiff was at first uncooperative. (*See* Pl. Dep. 137:1–5; 145:3–9; 143:7–13; 146:5–8; 163:18–21, Ex. 1.)

> A: The male doctor. And I told him that I didn't want to do a – and I told him, "If you do the CAT scan, is that, like, a loophole or way around it?" And he said, "Yes." He said, "Because if they do that and it shows you have nothing, then there's no need for them to do that to you." And I was, like, "All right."

(Pl. Dep. 196:13–197:6, Ex. 1.)

Turning to Plaintiff's testimony, he states that he was "complaining" and was "unhappy" about the digital cavity search. (Pl. Dep. 158:18–24, Ex. 1.)

After the male doctor informed Plaintiff that he would receive a rectal examination, Plaintiff testified to the following:

> Q: Okay. Hold on. So after the older gentleman with salt-and-pepper hair steps out, does he ever come back?
>
> A: Yes, he does.
>
> Q: Describe it.
>
> A: He comes back in, and he said, "I've got orders to do the cavity search, and that's what we're going to do."
>
> Q: And then what does this older doctor do?
>
> A: Tell [sic] her to prep, and that's when she told me – he left. She – he left, and then she said, "I'll be back. I'm going to get everything ready." And she heard me saying, "That's bulls***." And she said, "Oh, well, at least it's a female, not a male."

(Pl. Dep. 150:22–151:10, Ex. 1.)

But nowhere in the record does Plaintiff say that he did not consent to Dr. Lopez's rectal examination. The Court is hesitant to draw the inference that Mr. Ramirez's complaining meant no consent was given, but drawing all reasonable inferences in Plaintiff's favor, a genuine issue of material fact exists as to whether Mr. Ramirez provided consent. Thus, the Court proceeds with the analysis of the state law claims.

**2. State Law Claims**

**a. Battery**

The same standard for battery, articulated in Section (III)(B)(3) above, applies. Here, there is a genuine issue of material fact as to whether Dr. Lopez committed a battery by performing a rectal examination without consent. *See Hudacko v. Regents of Univ. of California*, No. 3:23-CV-05316-SI, 2024 WL 3908113, at *14 (N.D. Cal. Aug. 20, 2024) ("It is well settled that a physician who performs a medical procedure without the patient's consent commits a battery irrespective of the skill or care used." (citing *Conte v. Girard Orthopaedic Surgeons Med. Grp., Inc.*, 107 Cal. App. 4th 1260, 1266 (2003)), *aff'd*, No. 24-7360, 2025 WL 2965766 (9th Cir. Oct. 21, 2025).

Accordingly, the Court denies Dr. Lopez's summary judgment motion as to the battery claim.

**b. Assault**

The same standard for assault, articulated in Section (III)(B)(3) above, applies. Here, there is a genuine issue of material fact as to whether Dr. Lopez committed an assault by performing a rectal examination without consent. *See Estrada v. Orwitz*, 75 Cal. App. 2d 54, 57 (1946) ("There can be no doubt that an action based on the theory that an operation is performed without consent of the patient charges an assault and battery[.]"); *see also Keum v. Virgin Am. Inc.*, 781 F. Supp. 2d 944, 954 (N.D. Cal. 2011) ("By conceding the sufficiency of Keum's claim for battery, Virgin has effectively conceded the sufficiency of Keum's claim for assault.").

Accordingly, the Court grants summary judgment in Dr. Lopez's favor as to the assault claim.

**c. Sexual Battery**

The same standard for sexual battery, articulated in Section (III)(B)(3) above, applies. Here, Plaintiff has produced no evidence that Dr. Lopez intended to cause a sexually offensive contact. *Cf. Nixon in Int. of Moore v. Buck*, No. CV 19-04610-CJC(SHSx), 2019 WL 6620504, at *5 (C.D. Cal. Sept. 11, 2019) (denying a motion to

dismiss the sexual battery claim where the plaintiff alleged the defendant injected him with methamphetamine and then performed various sexually graphic acts).

Accordingly, the Court grants summary judgment in Dr. Lopez's favor as to the sexual battery claim.

**d. Bane Act**

The same standard for the Bane Act, articulated in Section (III)(B)(3) above, applies. "A defendant is liable if he or she interfered with or attempted to interfere with the plaintiff's constitutional [or statutory] rights by the requisite threats, intimidation, or coercion." *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947, 956 (2012). Even if Plaintiff's rights under statutory law survive summary judgment, Plaintiff provides no evidence that Dr. Lopez used threats, intimidation, or coercion in allegedly interfering with those rights.[17] *See Venegas v. Cnty. of Los Angeles*, 32 Cal. 5th 820, 843 (2004) ("Civil Code section 52.1 does not extend to all ordinary tort actions . . . its provisions are limited to threats, intimidation, or coercion that interferes with a constitutional or statutory right.").

Accordingly, the Court grants summary judgment in Dr. Lopez's favor as to the Bane Act claim.

**e. Negligence**

The same standard for negligence, articulated in Section (III)(B)(3) above, applies. Here, there is a genuine issue of material fact regarding the standard of care and proper scope of a rectal examination. And Dr. Lopez's attorney conceded at the summary judgment hearing that there is a genuine issue of material fact regarding the number of fingers used to conduct the examination,[18] and by extension, a genuine issue of material

---

[17] Plaintiff states that he is not required to prove separate intimidation or coercion where they are inherent to the constitutional violation. True, "the Bane Act does not require the 'threat, intimidation, or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 800 (2017)). But the Court granted summary judgment on the constitutional claims.

[18] Plaintiff's testimony reflects that Dr. Lopez "put three fingers in" inserted "to the base" for "[p]robably 30 seconds." (Pl. Dep. at 160, Ex. 1.) Plaintiff claims he felt blood within minutes and bled from his anus for ten days. (Pl. Dep. at 164–65, Ex. 1.) In contrast, Dr. Lopez attests that a standard rectal

fact regarding the standard of care.[19] (ECF No. 76.) Accordingly, the Court denies Dr. Lopez's motion for summary judgment as to the negligence claim.

**f. Sexual Harassment**

California Civil Code § 51.9 states, in relevant part:

> (a) A person is liable in a cause of action for sexual harassment under this section when the plaintiff proves all of the following elements:
>
> (1) There is a business, service, or professional relationship between the plaintiff and defendant or the defendant holds himself or herself out as being able to help the plaintiff establish a business, service, or professional relationship with the defendant or a third party. Such a relationship may exist between a plaintiff and a person, including, but not limited to, any of the following persons:
>
> (A) Physician, psychotherapist, or dentist. For purposes of this section, "psychotherapist" has the same meaning as set forth in paragraph (1) of subdivision (c) of Section 728 of the Business and Professions Code.
>
> (2) The defendant has made sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual

---

examination lasts only seconds, with the insertion of a finger 1 to 1.5 inches into the anal cavity. (Lopez Dep. at 81:23–82:6, Ex. D, ECF No. 61-6.)

[19] The experts also disagree regarding whether the standard of care was satisfied. Dr. Nordt's declaration states that the rectal examination met the standard of care. (Nordt Decl. Ex. E, ECF No. 61-7; *see also* Lopez Dep. 100:20–24, 135:2–6, Ex. D.) While Dr. Chakravarthy's report indicates that the rectal examination fell below the standard of care. (Chakravarthy Rep. at 47, Ex. 8, ECF No. 66-8.)

In Reply, Dr. Lopez objects to the report of Dr. Chakravarthy under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Specifically, Dr Lopez claims that there are insufficient facts to support the analysis. (Lopez Reply 2:7–12, ECF No. 69.) Whether or not Dr. Chakravarthy's report satisfies *Daubert*, the record reflects a genuine issue of material fact regarding the details of the rectal examination relevant for the standard of care.

> nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe.
>
> (3) The plaintiff has suffered or will suffer economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right, as a result of the conduct described in paragraph (2).

Cal. Civ. Code § 51.9.

Plaintiff cannot bring a sexual harassment claim against Dr. Lopez because Plaintiff cannot satisfy element two of the statutory text, which requires evidence of "unwelcome and pervasive or severe" sexual harassment. Even if the contact was unwelcome, the interaction was a one-time encounter between the parties that cannot be categorized as pervasive or severe. *cf. JB Doe v. United States*, No. 2:24-CV-03601-MEMF-AJR, 2025 WL 4093520, at *7 (C.D. Cal. June 24, 2025) (noting that the sexual advances were "pervasive given the months-long sexual relationship"). And, as explained in the sexual battery claim, there is no evidence to support the characterization of the conduct as sexual. Accordingly, the Court grants summary judgment in Dr. Lopez's favor as to the sexual harassment claim.

**g. Intentional Infliction of Emotional Distress**

The same standard for IIED, articulated in Section (III)(B)(3) above, applies. As a matter of law, Plaintiff has not demonstrated severe or extreme emotional distress; although Plaintiff states he was "embarrassed" and the experience was "traumatic," an IIED action demands more. (Pl. Dep. 170:8–17, 181 Ex. F.) *See Iverson v. Marion Cnty. Oregon*, No. CV 00-867-AS, 2001 WL 34041861, at *4 (D. Or. May 8, 2001) (dismissing an IIED claim in part given lack of sufficient distress, where "Plaintiffs state they suffered psychologically and physically, but do not cite a single example of how that suffering manifested itself, for example, requiring them to stay in bed for weeks"), *aff'd*, 56 F. App'x 822 (9th Cir. 2003). Accordingly, the Court grants summary judgment in Dr. Lopez's favor as to the IIED claim.

In conclusion, no reasonable jury could find that Dr. Lopez engaged in state action. The Court therefore grants summary judgment in Defendant Dr. Lopez's favor on all federal causes of action. But there remains a genuine issue of material fact regarding several of the state law claims. Specifically, the Court denies the motion for summary judgment on the state law claims of battery, assault, and negligence, and the Court grants the motion in Dr. Lopez's favor on all other state law claims.

**E. Punitive Damages**

Defendants also seek summary judgment on the issue of punitive damages. In a state law tort action involving "oppression, fraud, or malice," a plaintiff may also seek punitive damages under California law. *See* Cal. Civ. Code § 3294 (allowing recovery of punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice"); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (noting that the "Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor" (citation omitted)).

Here, viewing evidence in the light most favorable to Plaintiff, the Court concludes that summary judgment on the issue of punitive damages is premature. *See, e.g.*, *Moayery v. State Farm Gen. Ins. Co.*, No. 2:22-cv-09261-MEMF-(Ex), 2023 WL 8359856, at *9 (C.D. Cal. Nov. 30, 2023) ("[B]ecause the punitive damages claim is based on the reasonableness of State Farm's conduct, the Court concludes that State Farm is not entitled to summary judgment on this claim."). Accordingly, the Court denies Defendants' motions for summary judgment on punitive damages.

**IV. CONCLUSION**

Upon review, the Court **GRANTS** County Defendants' motion for summary judgment. (ECF No. 60.) Specifically:

- The Court **GRANTS** County Defendants' motion for summary judgment on the Fourth Amendment claims against Detective Kearney and the transportation deputies;

- The Court **GRANTS** County Defendants' motion for summary judgment on the Eighth Amendment claims against Detective Kearney and the transportation deputies;
- The Court **GRANTS** County Defendants' motion for summary judgment on the state law claims against Detective Kearney and the transportation deputies; and
- The Court **GRANTS** County Defendants' motion for summary judgment on the Bane Act claim against the County of San Diego.

Further, the Court **GRANTS IN PART** and **DENIES IN PART** Dr. Lopez's motion for summary judgment. (ECF No. 61.) Specifically:

- The Court **GRANTS** Dr. Lopez's motion for summary judgment on the Fourth Amendment claim, given that she did not engage in state action;
- The Court **GRANTS** Dr. Lopez's motion for summary judgment on the Eighth Amendment claim, given that she did not engage in state action;
- The Court **DENIES** Dr. Lopez's motion for summary judgment on the battery, assault, and negligence state law claims;
- The Court **GRANTS** Dr. Lopez's motion for summary judgment on all other state law claims; and
- Finally, the Court **DENIES** Dr. Lopez's request for summary adjudication of the punitive damages issue.

In light of this ruling, the Court **ORDERS** the parties to contact the magistrate judge on or before **September 4, 2026**, to set a new scheduling order.

**IT IS SO ORDERED.**

**DATED: August 28, 2026**

Cynthia Bashant

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**